IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KASHIF ABBAS, TITIN ATMADJA, MARC BIVIANO, DANIEL LAMBERT, TAYLOR YUNIS, and 9392-3100 QUEBEC, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SECTION 8 CONSULTING, LLC f/k/a FREEDOM FOR LIFE, LLC; RECESSION PROOF BLUEPRINT, LLC; and KARIM NAOUM, <br><br> Defendants | Case No. 25 C 716 <br><br> Judge Joan H. Lefkow |

## OPINION AND ORDER

Plaintiffs Kashif Abbas, Titin Atmadja, Marc Biviano, Daniel Lambert, Taylor Yunis, and 9392-3100 Quebec, Inc. (Quebec) bring suit against defendants Section 8 Consulting LLC f/k/a Freedom for Life LLC a/k/a Recession Proof Blueprint and Karim Naoum, alleging breach of contract and fraudulent misrepresentation. Defendants move to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the court lacks subject matter jurisdiction. (Dkt. 15.) In the alternative, defendants move for a more definite statement of how plaintiffs reached their damages calculations, pursuant to Federal Rule of Civil Procedure 12(e). (Dkt. 15.) For the reasons set forth below, the court grants defendants' motion in part and dismisses the second amended complaint.

**BACKGROUND**[1]

The allegations are as follows:[2] Section 8 Consulting is a Louisiana corporation formed and operated by Naoum, a citizen of California. Abbas is a citizen of Illinois; Atmadja is a citizen of New Hampshire; Biviano is a citizen of Massachusetts; Lambert is a citizen of New York; Yunis is a citizen of Florida; and Quebec is a citizen of Canada. Each plaintiff entered into a contract with Section 8 Consulting wherein the company agreed to provide services and mentorship concerning Section 8 rental properties to each plaintiff in return for a fee.

Most plaintiffs' contracts include a promise that by signing the contract and joining Section 8's mentorship program, they will receive, among other things, "Hand Holding for the first **5** properties." (Dkt. 14-1 at 2 (Lambert Contract); dkt. 14-2 at 2 (Biviano Contract); dkt. 14-3 at 2 (Atmadja Contract); dkt. 14-4 at 2 (Quebec Contract).) Yunis's contract promises "Hand Holding for the First 15 Section 8 properties." (Dkt. 14-5 at 1 (Yunis Contract).) Abbas's contract was not included as an exhibit but is substantially like the others. The contracts for Biviano, Atmadja, Quebec, and Yunis provide that in consideration of the mutual obligations in the contract, the parties "agree as follows: Guaranteed first revenue within 6 to 8 weeks otherwise we fulfill on a DONE FOR YOU service. Revenue is defined as $500-$800 USD per door." (Dkt. 14-2 at 2; dkt. 14-3 at 2; dkt. 14-4 at 2; dkt. 14-5 at 2.) Lambert's contract does not contain this provision. (Dkt. 14-1 at 2.) Plaintiffs paid the following amounts in initial fees:

---

[1] Attached to the second amended complaint are each plaintiff's contract with Section 8 Consulting, except Abbas, whose contract is not available. Because they were attached to the complaint, the contracts are part of the pleadings, and the court can consider them without converting defendants' motion to dismiss into one for summary judgment. *See Beanstalk Grp., Inc.* v. *AM Gen. Corp.*, 283 F.3d 856, 858 (7th Cir. 2002) (citations omitted).

[2] Because defendants' motion to dismiss is a factual challenge to the court's jurisdiction, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists…. [N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Apex Digital, Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal citations omitted).

Abbas paid $2,500; Atmadja paid $12,500; Biviano paid $10,000; Lambert paid $5,000; Yunis paid $25,000; and Quebec paid $10,000.

Defendants allegedly "fail[ed] to perform the agreed-upon mentorship services"; "fail[ed] to provide guaranteed initial revenue…, of 5 turn-key section 8 approved properties…, within 6 to 8 weeks…, of $500 - $800 USD per door"; [3] and "fail[ed] to deliver promises of future revenue." (Dkt. 14 ¶ 25) (internal quotations omitted). Defendants "expressly guaranteed Plaintiffs they would find[] first 5 turn-key section 8 approved properties, finding qualified and reliable management and maintenance contacts to have on retainer, obtaining lending options, finding and accepting qualified section 8 approved tenants, managing and scaling a section 8 real estate business." [*sic*] (Dkt. 14 ¶ 17) (internal quotations omitted).

Plaintiffs alleges that as a result of defendants' breach of contract and fraudulent misrepresentation, they suffered the following damages: Abbas lost $2,500 in initial fees; $52,000 in guaranteed initial revenue; and $96,000 in guaranteed future revenue. Atmadja lost $12,500 in initial fees; $40,000 in guaranteed initial revenue; and $96,000 in guaranteed future revenue. Biviano lost $10,000 in initial fees; $40,000 in guaranteed initial revenue; and $96,000 in guaranteed future revenue. Lambert lost $5,000 in initial fees; $52,000 in guaranteed initial revenue; and $96,000 in guaranteed future revenue. Yunis lost $25,000 in initial fees; $52,000 in guaranteed initial revenue; and $96,000 in guaranteed future revenue. Quebec lost $10,000 in initial fees; $32,000 in guaranteed initial revenue; and $96,000 in guaranteed future revenue.

---

[3] The sentence in text has been spliced together from two separate clauses in the contract. One clause reads, "Hand Holding for the first **5** properties. Including finding first 5 'turn-key' section 8 approved properties, finding qualified and reliable management and maintenance contacts to have on retainer, obtaining lending options, finding and accepting qualified section 8 approved tenants, managing and scaling a section 8 real estate business." (Dkt. 14-2 at 2.) The other clause provides, "In consideration of the matters described above and of the mutual benefits set forth in this Agreement, [parties] … agree as follows: Guaranteed first revenue within 6 to 8 weeks otherwise we fulfill on a DONE FOR YOU service. Revenue is defined as $500-$800 USD per door." (Dkt. 14-2 at 2.)

**LEGAL STANDARD**

Federal district courts are courts of limited jurisdiction and possess "only that power authorized by Constitution and statute." *Kokkonen* v. *Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (citations omitted). District courts have original jurisdiction over civil actions between citizens of different states "where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332. "[T]he jurisdictional amount should be assessed looking at either the benefit to the plaintiff or the cost to the defendant of the requested relief." *Uhl* v. *Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 983 (7th Cir. 2002) (citations omitted).

"[T]he party asserting federal jurisdiction has the burden of proof to show that jurisdiction is proper." *Travelers Prop. Cas.* v. *Good*, 689 F.3d 714, 722 (7th Cir. 2012) (citing *McNutt* v. *Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). Typically, courts accept the amount in controversy as pleaded by the plaintiffs, "unless it 'appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount.'" *McMillian* v. *Sheraton Chicago Hotel & Towers*, 567 F.3d 839, 844 (7th Cir. 2009) (quoting *Rexford Rand Corp.* v. *Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995); *see also St. Paul Mercury Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 289 (1938).

But when there is a challenge to the amount in controversy, as there is here, plaintiffs must support their assertions that they have met the $75,000 threshold with competent proof by a preponderance of the evidence. *Kaplan* v. *Jewett*, 229 F. Supp. 3d 731, 734 (N.D. Ill. 2017) (citing *McMillian*, 567 F.3d at 844). To satisfy their burden, plaintiffs must do more than "point to the theoretical availability of certain categories of damages." *Id*. (quoting *Am. Bankers Life Assur. of Florida* v. *Evans*, 319 F.3d 907, 909 (7th Cir. 2003)). To meet the amount-in-

4

controversy requirement, "the separate claims of multiple plaintiffs against a single defendant cannot be aggregated." *McMillian*, 567 F.3d at 844 (quoting *Clark* v. *State Farm Mut. Auto. Ins. Co.*, 473 F.3d 708, 711 (7th Cir. 2007).

## **ANALYSIS**

Plaintiffs argue that the court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity among each of the plaintiffs and the defendants, and the amount in controversy exceeds $75,000 for each plaintiff. Defendants argue that plaintiffs fail to meet the amount-in-controversy threshold of $75,000 because "Plaintiffs never explain how they get to between $32,000 to $52,000 per Plaintiff in 'guaranteed initial revenue' and '$96,000 for guaranteed future revenue' per Plaintiff against Defendants." (Dkt. 15 at 7.)

Each plaintiff alleges three categories of damages: initial fees they paid for Section 8 Consulting's services, guaranteed initial revenue, and guaranteed future revenue. The initial fee paid by each plaintiff ranges from $2,500 to $25,000. Defendants do not dispute these amounts. Moreover, these amounts are recoverable damages under California law (which governs the contracts) for fraudulent misrepresentation and breach of contract. *See Lewis Jorge Constr. Mgmt., Inc.* v. *Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967–68 (2004) ("[T]he plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain."); *All. Mortg. Co.* v. *Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (citation omitted) ("There are two measures of damages for fraud: out-of-pocket and benefit of the bargain."). These alleged damages can count toward the amount in controversy for jurisdictional purposes. *See Kaplan*, 229 F. Supp. 3d at 734. But no individual plaintiff clears the $75,000 threshold on the category of initial fees alone.

5

So, the court turns to the next category: guaranteed initial revenue. Despite plaintiffs' assertions that the calculation leading to the totals in this category "is a rather simple one," (dkt. 17 at 6) the origins of these totals remain opaque to the court. Take, for example, Plaintiff Yunis. Yunis's guaranteed initial revenue or "benefit-of-the-bargain" total is $52,000. (Dkt. 17 at 5.) Plaintiffs assert this amount is "self-explanatory by simply determining the months between the date a Plaintiff signed the Contract and the date suit was filed and multiplying that number by the '$800 USD per door' Defendants guaranteed for initial revenue. As noted, Taylor Yunis' alleged 'benefit-of-the-bargain' damages are $52,000 (13 months x $800)." (Dkt. 17 at 5.) But 13 multiplied by $800 does not equal $52,000. It equals $10,400. Moreover, Yunis signed his contract on June 5, 2024. The initial complaint in this matter was filed on January 22, 2025. That would account for about seven months of damages, not 13 months. Even going by the date the Second Amendment Complaint was filed—April 26, 2025—damages would total to 10 months, not 13 months.[4]

It is also unclear how plaintiffs arrived at these numbers and what the correct numbers should be.[5] As pleaded, plaintiffs have failed to show "by competent proof" the amount of their

---

[4] Plaintiff Lambert's number of months also appears miscounted, but his contract does not contain the clause providing guaranteed initial revenue anyway. As such, he has failed to allege defendants breached any promise of guaranteed initial income and has not shown he is entitled to this category of damages.

[5] It appears plaintiffs have added an unseen multiplier of five to each guaranteed initial revenue calculation, though this is not stated anywhere in the complaint or the response. The court is led to this conclusion because plaintiffs splice together two separate clauses of the contracts to allege that defendants breached the contracts by "failing to provide 'guaranteed initial revenue[']…, of '5 'turn-key' section 8 approved properties…,' 'within 6 to 8 weeks…,' of '$500 - $800 USD per door.'" (Dkt. 14 at ¶ 25.) Conceivably, plaintiffs arrived at their guaranteed initial revenue numbers by assuming that they were promised five turn-key Section 8-approved properties per month, with each property earning them $800, for every month they were party to the contract (for Yunis: 5 multiplied by 13 then multiplied by $800 equals $52,000, although the fact that Yunis's contract promises 15 turn-key properties rather than five like all the other contracts and that he was party to the contract for seven months instead of 13 complicates this assumption.) But if this is indeed how plaintiffs arrived at their totals, plaintiffs need to make these allegations in their complaint rather than rely on the court and defendants to read the tea leaves of their damages totals. *See U.S. ex rel. Garst* v. *Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) (holding that Fed. R. Civ. P. 8 requires parties to "make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud"). Plaintiffs also must plead the correct number of months that they have been in the contracts, as they are using that number as a multiplier. In so pleading, plaintiffs must also

6

guaranteed initial revenue. *See Johnson* v. *Olson*, No. 14 C 02551, 2015 WL 1119418, at *1 (N.D. Ill. Feb. 26, 2015) (finding, in a motion challenging amount in controversy, that plaintiff offered "no competent proof" by asserting in her complaint that her horses were valued at $5,000 each and instead crediting defendants' sworn declaration from a horse valuation professional opining they were worth $500 each). Plaintiffs' guaranteed initial revenue amounts cannot be included in their amount-in-controversy totals.

A third category of damages, however, would put each plaintiff above the $75,000 threshold, if properly pleaded, even without including the category of guaranteed initial revenue. Each plaintiff alleges they have suffered $96,000 in lost guaranteed future income. Again, because the amount in controversy is being challenged, plaintiffs must support their allegations of the amount in controversy with competent proof by a preponderance of the evidence. *McMillian*, 567 F.3d at 844. Plaintiffs fall short of that standard in this category as well.

Plaintiffs make no allegation and point to no language in any of the contracts that they were guaranteed future income. They make no effort to explain where the $96,000 figure came from. They simply assert that "Defendants breached the express, material terms of the contract for their failure … to provide … future revenue" (dkt. 14 at ¶ 29) and that "Defendants knowingly made false representations about providing mentorship services and guaranteed … future revenue." (Dkt. 14 at ¶ 32.) They do not say what contract term promised future revenue, what false representations were made concerning providing guaranteed future revenue, and why the harm amounted to $96,000 for each plaintiff.[6] When it comes to the alleged loss of

---

explain why the clause promising "Hand Holding for the first **5** properties" should be applied as a multiplier to the clause where parties agree that contract consideration is "guaranteed first revenue within 6 to 8 weeks … [where] Revenue is defined as $500-$800 USD per door" and why that should continue for every month they were party to the contract. (*See* dkt. 14-2 at 2.)

[6] Plaintiffs also assert that "[f]or future losses, Plaintiffs unite to enforce a single right or title in which they have a common and undivided interest." (Dkt. 14 ¶ 40.) Plaintiffs do not elaborate on what this means and why

guaranteed future income, plaintiffs are merely "point[ing] to the theoretical availability of [a] certain categor[y] of damages." *See McMillian*, 441 F.3d at 844 (citation omitted). Conclusional statements that defendants promised—and then failed to provide—future income to plaintiffs do not satisfy plaintiffs' burden to prove the jurisdictional facts by a preponderance of the evidence. *See Meridian Sec. Ins. Co.* v. *Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006). As pleaded, this category cannot count toward plaintiffs' amount-in-controversy total.

As a result, only plaintiffs' first category of damages counts toward their amount-in-controversy threshold. As no plaintiff has damages in this category that exceed $25,000, each of them fails to meet the amount-in-controversy requirement for diversity jurisdiction. The court, therefore, lacks subject matter jurisdiction to adjudicate the merits of this case.

## **CONCLUSION AND ORDER**

For the foregoing reasons, Section 8 Consulting's motion to dismiss (dkt. 14) is granted for lack of subject matter jurisdiction. The court does not reach defendants' argument related to Federal Rule of Civil Procedure 12(e), as it is moot. Case is dismissed without prejudice to filing a third amended complaint or pursuing their claims in an appropriate state court. Plaintiffs may file a third amended complaint by January 14, 2026.

Date: December 17, 2025

U.S. District Judge Joan H. Lefkow

---

plaintiffs who each signed separate contracts with Section 8 Consulting should have a common and undivided interest in $96,000 in future guaranteed revenue *each*.